IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| SHARON BRIDGES, | ) | C/A No. 4:11-1517-RBH-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| AMIKIDS BENNETTSVILLE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

Plaintiff Sharon Bridges ("Plaintiff" or "Bridges") filed this action on June 21, 2011,

against her former employer, AMIkids Bennettsville, Inc. ("Defendant" or "AMIkids"),

alleging causes of action for sexually hostile work environment and retaliation, both in

violation of Title VII of the Civil Rights Act of 1964, in connection with her employment

and termination therefrom. ECF No. 1. The case comes before the court on motion of

Defendant for summary judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure. ECF No. 26. Plaintiff filed a Response, opposing the motion, ECF No. 28, and

Defendant filed a Reply, ECF No. 29. All pretrial proceedings in this case were referred to

the undersigned pursuant to the provisions of 28 U.S.C. § (b)(1)(B) and Local Rule

73.02(B)(2)(g), D.S.C. Because the motion for summary judgment is dispositive, this Report

and Recommendation is entered for the district judge's consideration.

I. Factual Background

Defendant is a non-profit organization that operates, under contract with the South

Carolina Department of Juvenile Justice, a residential educational program for male juvenile

offenders between the ages of 14 and 20 years of age in Bennettsville, South Carolina. ECF

No. 26 at 5-6. The facility, known as Camp Bennettsville, is affiliated with AMIkids, Inc., a Florida non-profit corporation focused on juvenile rehabilitation, which provides administrative and human resources support to AMIkids Bennettsville and its other affiliated programs. ECF No. 26 at 6.

Plaintiff was employed with Defendant on January 28, 2008, as a night watchman at Camp Bennettsville. ECF No. 26 at 7.  In October, 2008, Plaintiff sought and received a promotion to the position of Behavior Modification Specialist. ECF No. 26 at 8.  As a behavior modification specialist, Plaintiff was responsible for, among other things, providing "redirection and counseling to students who exhibit inappropriate behavior in the classroom setting…" and making a "positive impact on the students and staff through role modeling, development and continuing education."   ECF No. 26-3 Ex. 3.  Operationally, Behavior Modification Specialists work in one of three five-person teams at Camp Bennettsville, led by a working shift supervisor, or team leader.  ECF No. 26 at 9.  Initially, Plaintiff worked with Team Leader Dwight Hunter ("Hunter").  After approximately one year of working with Hunter, Tyrone Parnell ("Parnell") became Bridges' team leader.  ECF No. 26 at 9.   Camp Bennettsville's Executive Director during all times relevant to this matter was Jerome Platt ("Platt").

Between March 10, 2010, and April 24, 2010, Parnell sent four text messages to Bridges' cell phone.  ECF No. 26-2 at 30-35.  The messages were as follows:

> 1.) (Received on Wednesday, March 10, 2010, 2:18 pm)
> From Tyrone Parnell: "I couldn't hear what you were saying I just kept thinking about rubbing your feet with the lotion on your desk and sucking your toes."
> 2.) (Received on Saturday April 10, 2010, 6:42 pm)
> From Tyrone Parnell:  "Did Keishah give you a set of van keys?  You never did answer my question on how high did you go when you shaved your legs!!!"
> 3.) (Received on Saturday, April 10, 2010, 7:54 pm)
> From Tyrone Parnell:  "Give me a hint, God will forgive you."

4.) (Received on Saturday, April 24, 2010, 1:51 pm)
From Tyrone Parnell: "If you get this text, what about pick me up a six pack of pussy on the way back."

ECF No. 28-7.

Bridges showed the text messages to Hunter, who was her former team leader, and to Tyron Abraham, who was a volunteer not employed by Defendant. ECF Nos. 26-5 ¶ 4; 28 at 3. She also showed them to Keisha Streeter, an hourly paid team member, after Streater showed Plaintiff a text message that Streater had received from Parnell. ECF, No. 26-5 ¶ 11; 26-2 at 63. Plaintiff did not respond to the texts or confront Parnell about them, and she did not report the texts to anyone else at Defendant until June 8, 2010, when she completed an incident report. ECF Nos. 28-5, 26-2 at 24.

On May 16, 2010, Plaintiff took several students on a trip from Camp Bennettsville to Orangeburg, South Carolina for a program referred to as the AMI Olympics. ECF No. 26 at 11. Plaintiff was accompanied on the trip by Tyron Abraham ("Abraham"), a former employee of Defendant who was volunteering for the program while in Orangeburg, and who had founded the Camp Bennettsville Praise Team while he had been employed. While at the AMI Olympics, Abraham had a verbal altercation with a student from Camp Bennettsville during which Abraham told the student he would "f___ him up." ECF No. 26-2 at 78-79. Plaintiff called Camp Bennettsville and reported the communication to Parnell as inappropriate and asked what she should do. ECF No. 26 at 11. While waiting for the answer, Executive Director Platt walked up to Plaintiff and recommended the students return to the camp, and Plaintiff complied with the recommendation. ECF No. 26 at 11. The next day, May 17, 2010, Plaintiff met with Parnell and Abraham. Abraham asked Plaintiff why she had called the office and reported his verbal altercation with the student the day before.

She stated it was what she was supposed to do. ECF No. 28-4 at 81. Several days later, Platt called a meeting with Plaintiff, Parnell and Abraham about the verbal altercation. ECF No. 28-4 at 82. In the meeting, Platt had everyone tell his or her side about the incident. *Id.* After the meeting, Platt moved Bridges from the Praise Team assignment on which she had worked with Abraham. ECF 26-5 ¶ 4; 28-4 at 84.

After the meeting with Platt, Plaintiff's relationship with Parnell and Abraham changed. Abraham was very upset with her, and Plaintiff felt he tried to get her in trouble on numerous occasions. ECF No. 28-4 at 83-84. Parnell no longer spoke to her, and Plaintiff felt he was scrutinizing her actions and trying to get her written up for petty things. ECF No. 26-2 at 96.

In late May, 2010, Platt received an anonymous report that Plaintiff had been involved in an inappropriate relationship with a male resident ("John Doe"). ECF No. 26 at 12. In response to the report, Platt interviewed both Plaintiff and John Doe, who each denied the existence of any inappropriate dating relationship. ECF No. 26-5 ¶ 10.

On June 4, 2010, Keisha Streater gave her office key to Plaintiff, so that Plaintiff could do something for her the next morning. ECF No. 26-2 at 15. After working her normal 4:00 p.m.-to-midnight shift on June 5, 2010, Bridges left Camp Bennettsville and realized upon arriving at her home that she had lost Streater's key. Bridges changed clothes and returned to Camp Bennettsville at approximately 1:00 a.m. to look for the lost key. ECF No. 26-2 at 14-15; 26-5 ¶ 12. At some point when she was back at Camp Bennettsville, she entered the dormitory where she had been working her shift that day (ECF. No. 26-2 at 16) and got John Doe (the same male resident who had been identified in the anonymous report of an inappropriate relationship), to help her look for the key. ECF No. 26-2 at 16; ECF No.

26-5 ¶ 12.  Plaintiff chose John Doe to help her because she thought he had been with her when she lost the key.  ECF No. 26-6 at 66.  Plaintiff and John Doe left the dormitory together, but the two did not find the key. ECF 26-2 at 72.  After ten or fifteen minutes, Plaintiff brought John Doe back to where others were still looking for the key. ECF 26-2 at 23, 98.  She then returned home.  *Id.*  Plaintiff found the key the next morning on the steps outside her home.  ECF No. 26-3 at 71.

On June 7, 2010, Platt received a report from Night Watchman Dianna Stubbs that Plaintiff had arrived at Camp Bennettsville the previous night at approximately 1:00 a.m. dressed differently than she had been while at work earlier that day. ECF No. 26-5 ¶ 12, 26-6 at 48.  The report stated Plaintiff had gotten a male student out of his dorm, escorted him to a separate building alone, stayed in the building with the student for about fifteen minutes and then returned him to the dorm. *Id.* The report identified the student, and that student was known to Platt to be the same student about whom the report of an inappropriate relationship with Plaintiff had been made. ECF Nos. 26 at 13, 26-5 ¶ 12.  Platt then asked for an incident report from the other Night Watchman who had observed the incident, and the second report documented the incident as well.  ECF No. 26-6 at 47-49.

Also on June 7, 2010, Platt received a telephone call from a grandparent of a student, inquiring about $75.00 that the grandparent had sent to Camp Bennettsville in early April 2010, in care of Plaintiff, to be used for the student during an upcoming trip.  ECF No. 26-6 at 8.  Plaintiff testified she had kept the money on her person for about a week and a half but when the trip was cancelled, she asked Abraham what to do, and he told her to send it back to the grandparent.  ECF No. 26-2 at 56.  Plaintiff did so, but the grandparent complained to Platt that he had not received it. ECF No. 26-6 at 63-65.  Plaintiff believes that Parnell had

been trying to get the grandparent to call Camp Bennettsville to complain because he was angry with her over the Olympics incident. ECF No. 26-2 at 12-13, 46-48.

Later on June 7, 2010, Platt had a meeting with Plaintiff at which Business Manager Theresa Judge was present and took notes. ECF No. 26-6 at 7. At this meeting, Platt asked Plaintiff about the lost key incident. ECF No. 26-6 at 66-67. She confirmed she had returned to Camp Bennettsville around 1:00 a.m. on the morning in question to look for the lost key. She further stated that when she went to the dorm, John Doe was already awake and that he came with her to the kitchen to look for the key. She did not feel that going into the dorm at night was a problem because she works in that dorm and is often with the students alone. ECF No. 26-2 at 17-20. Platt told her that getting a student from the dorm at night alone was "not a good thing to do" and "not a good idea" because it "generates speculation." ECF No. 26-6 at 66. Platt also discussed with Plaintiff the incident regarding the student's money that had been sent to Plaintiff. ECF No. 26-6 at 63. Plaintiff told Platt she had sent the money back, and Platt told her the grandparent claimed he had not received it. *Id.* Platt stated this would have to be "follow[ed] up with a disciplinary action," and unless Plaintiff had kept the receipt, she would have to pay it back herself. *Id*. Platt stated that "this could get serious." *Id*. Plaintiff told Platt she felt Abraham was behind this. ECF No. 26-2 at 24. Bridges could not find her receipt, so she sent a money order for $75.00 to the relative on June 14, 2010. ECF 26-6 at 76.

After Platt left the meeting, Plaintiff stayed and talked with Judge, telling her that she would bring her cell phone the next day, but not yet mentioning the text messages themselves. ECF Nos. 26-6 at 70, 26-2 at 101. According to Platt, he spoke with Corporate Human Resources Director Valerie Fulbright and discussed Plaintiff's actions with her. ECF

No. 26-1 at 44, 57-58. Platt testified he then made the decision to terminate Plaintiff's employment, and the Human Resources Director supported the decision. ECF No. 26-1 at 58. Platt testified he made the decision to discharge Plaintiff before the incident report about Parnell had been brought to his attention. *Id.*

On June 8, 2010, Plaintiff brought her cell phone to Theresa Judge and let her listen to the audio version of the texts. ECF No. 26-2 at 44-5. Judge asked her to make a written incident report, and Plaintiff filled out a three-page report detailing her various complaints about Parnell. ECF No. 26-6 at 73-75. Judge told her she would fax the report to Platt because he was on a plane to Florida. ECF No. 26-2 at 45. Plaintiff's incident report stated that since the Olympic Games, Parnell had been saying things to students about her and that those things had been reported back to her by students. ECF No. 26-6 at 73. It further stated that Plaintiff felt Parnell was trying to get her fired, and that she felt this way because she had been called in front of Platt for minor things that had been blown out of proportion. *Id.* The report then set forth the content of the text messages she had received from Parnell, stating that Parnell knew she still had the texts, and she felt that was why he was trying to get her into trouble. ECF No. 26-6 at 74. It went on to discuss various incidents in which Parnell had spoken to students about things concerning Plaintiff rather than speaking directly to her, including a time when Parnell said she had to "get her shit together when she met with Platt" about the Olympics incident or she would "be in the unemployment line." ECF No. 26-6 at 75. The report stated Plaintiff was tired of "Tyrone and his buddies trying to get [her] fired all because I have these text[s]." *Id.* The report ended with Plaintiff's statement that she would be discussing "this" with a lawyer that morning. *Id.* Judge's notes state that she scanned and emailed the report to Platt that day, and that he called and asked her to read the

handwriting to him over the phone. Platt told Judge he would meet with Plaintiff when he returned. ECF No. 26-6 at 71.

On June 11, 2010, Plaintiff brought her attorneys to meet with Platt, but he arrived late, and the attorneys had already left. ECF 26-6 at 14-15.

Platt then investigated Bridges' claims regarding Parnell's text messages to her. At a June 16, 2010, meeting with Platt, Parnell denied sending any offensive text messages, but he conceded that he had sent some text messages to Bridges, and that he had made a verbal statement directly to Bridges about wanting to provide her with a foot massage. ECF No. 26-4 at 15. Parnell recalled making a verbal statement to Bridges about wanting to "suck her toes," (ECF No. 26-4 at 18) and acknowledged that such a comment is inconsistent with the company's harassment policy on which he had been trained. ECF No. 26-4 at 31-32. Parnell stated he first learned of Bridges' accusations of harassment when Platt confronted him about it on June 16, 2010. ECF No. 26-4 at 21. Platt subsequently provided written counseling to Parnell for his inappropriate communication to Bridges. ECF No. 26-4 at 15-18.

Defendant has a company policy stating, "AMIKIDS BENNETTSVILLE shall maintain strict key control in accordance with our primary objective of ensuring public safety. . . . Strict accountability of keys will be maintained. . . . Institute keys shall never be loaned or borrowed. . . . Lost keys are to be reported immediately to central control." ECF No. 26-5 at 5 ¶ 7, 31. Defendant also has a policy regarding the proper handling of juvenile funds. ECF No. 26-5 p. 8. The policy states, in part, "All student deposits and disbursements are to be handled through a separate checking account/trust fund for students…. The AA/DA or advisor should make out a receipt to the student for the amount of

the funds received." ECF No. 26-5 at 35. Plaintiff was not aware during her employment of the existence of these policies, however. ECF No. 26-2 at 15, 56.

On June 21, 2010, Platt had a meeting with Bridges in which he told her she was being terminated for policy violations, including the issues regarding her handling of the lost key and the missing money. ECF No. 26 at 15, 26-1 at 29-32.

II. Analysis

1. Summary Judgment Standard

Summary judgment is appropriate only when "there is no genuine issue as to any material fact, and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The role of the court in deciding a motion for summary judgment "is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In deciding a summary judgment motion, the court must look beyond the pleadings and determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. If a defendant carries its burden of showing an absence of evidence to support a claim, the plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986). In other words, Plaintiff "must present affirmative evidence in order to defeat a properly supported summary judgment motion. This is true even when the evidence is likely to be within Defendant's possession, as long as [Plaintiff] has a full opportunity to conduct

discovery." *Cooper v. United States*, 903 F. Supp. 953, 955 (D.S.C. 1995). An issue of fact is "material" only if establishment of the fact might affect the outcome of the lawsuit under governing substantive law. *Anderson,* 477 U.S. at 248. A complete failure of proof concerning an essential element of Plaintiff's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322–23. Moreover, production of a "mere scintilla of evidence" in support of an essential element will not prevent the granting of a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 251.

2. Hostile work environment claim

To survive a motion for summary judgment on her claim of sexually hostile work environment in violation of Title VII, Plaintiff must show that there is a genuine issue of material fact as to whether the offending conduct 1) was unwelcome, 2) was based upon her sex, 3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and was, 4) imputable to her employer. *Ocheltree v. Scollon Prods., Inc*., 335 F.3d 325, 331 (4th Cir. 2003). Defendant contends Plaintiff cannot establish a question of material fact as to the third element.[1] The undersigned agrees.

The "severe or pervasive" (third) element of a hostile work environment claim "has both subjective and objective components." *Ocheltree*, 335 F.3d at 333. First, Plaintiff must show that she "subjectively perceive[d] the environment to be abusive." *Harris v. Forklift Sys.*, 510 U.S. 17, 21-22 (1993). Next, Plaintiff must demonstrate that the conduct was such that "a reasonable person in the plaintiff's position" would have found the environment hostile or abusive. *Oncale v. Sundowner Offshore Servs.,* Inc., 523 U.S. 75, 81-82 (1998). In

---

[1] Defendant also pleads the affirmative defense that: (a) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by Defendant or to avoid harm otherwise. *Lissau v. So. Food Serv. Inc*., 159 F.3d 177, 182 (4th Cir.1998).

the case at bar, Defendant argues that Plaintiff did not subjectively perceive her work environment to be hostile because she testified that she had "no problems working with Tyrone Parnell prior to May 16th." ECF No. 26 at 16-17. While this admission might ordinarily establish a lack of subjective perception of a hostile environment on a plaintiff's part, the court must view the evidence in the light most favorable to Plaintiff. Taking the deposition's context into consideration, Plaintiff could have understood she had been directed to answer regarding problems *other* than the texts:

> Q. Prior to May 16th were there any problems with your communications with Tyrone Parnell other than these texts that we'll get to at some point later today?
> A. No, sir.
> Q. Did you have any problems working with Tyrone Parnell prior to May 16th?
> A. No, sir. ECF 26-2 at 14.

Thus, for the purpose of this motion the undersigned will assume that Plaintiff's answer here refers to problems other than the text messages.

The remaining evidence in the record, taken in the light most favorable to Plaintiff, however, shows that Plaintiff did not confront Parnell about the texts and did not report any harassment to management for quite some time. Although she shared the texts with three co-workers, there is no evidence that she discussed any negative feelings about the texts with them. In fact, she only shared the texts with Streater in response to Streater's revelation that she had received texts from Parnell. ECF No. 26-2 at 63. Moreover, there is no testimony or evidence in the record that Plaintiff found the text messages to be so severe and pervasive that they altered her conditions of employment and created an abusive environment. Plaintiff's description of the text messages in her incident report is completely devoid of any evidence that Plaintiff found the messages offensive, was upset by their contents, was humiliated or made afraid by them in any way. Instead, she expresses only anger at her

belief that Parnell was trying to get her fired because of the fact she had retained the text messages. *See* ECF No. 28-7. In her brief, she gives an unsupported statement that it is "clear that the text messages bothered [her]." ECF No. 28 at 13. Even if the evidence in the record can be said to support this contention, being "bothered" falls far short of the effect on Plaintiff that is required to satisfy the subjective component of her prima facie case.

Moving to the objective component of the inquiry, the undersigned finds that the record contains insufficient evidence to establish that Parnell's actions were so severe and pervasive as to alter the conditions of Plaintiff's employment and create an abusive environment. The Fourth Circuit has found that in determining whether harassment is "sufficiently severe or pervasive to bring it within Title VII's purview, [the court] must examine the totality of the circumstances, including '[t]he frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.'" *Hopkins v. Baltimore Gas and Elec. Co.*, 77 F.3d 745, 753 (4th Cir.1996) (quoting *Harris*, 510 U.S. at 23).

In this case, Parnell's conduct simply does not rise to the level of actionable harassment. There were only four text messages over a span of forty-five days during Plaintiff's two and one-half years of employment. Plaintiff was not physically touched, and sought no counseling or psychological help for harassment during the length of her employment. Nor does Plaintiff allege that her work quality was affected by the text messages. Rather, Plaintiff concentrates her complaints on the way Parnell and Abraham treated her after she reported Abraham's conduct at the AMI Olympics. She states that Parnell and she did *not* stop communicating after the text messages were sent, but rather that

they stopped communicating after the Olympics. ECF No. 26-2 at 13. The text messages are merely offensive utterances. *See Talamantes v. Berkeley Cnty. Sch. Dist*., 340 F. Supp. 2d 684 (D.S.C. 2004). The work environment must have been "permeated with discriminatory intimidation, ridicule, and insult. . . ." *Harris,* 510 U.S. at 21. Isolated or sporadic comments by an alleged harasser are not sufficient to create a hostile work environment. "Title VII was not designed to create a federal remedy for all offensive language and conduct in the work place." *Hopkins,* 77 F.3d at 754. For these reasons, Plaintiff fails to satisfy an essential element of her cause of action, and her claim of hostile work environment should be dismissed. [2]

3. Retaliation claim

Plaintiff next alleges that her employment was terminated in retaliation for reporting as sexual harassment the text messages she received from Parnell. The Fourth Circuit has held that the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), also applies in analyzing retaliation claims under Title VII. *Smith v. First Union Nat'l Bank,* 202 F.3d 234, 248 (4th Cir. 2000). Pursuant to the McDonnell Douglas burden-shifting analysis, in order to establish a retaliation claim, a plaintiff must first make out a prima facie case by showing: (1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal connection between the protected activity and the adverse employment action." *Hill v. Lockheed Martin Logistics Mgmt. Inc.,* 354 F.3d 277, 298 (4th Cir. 2004). Then, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. If the employer can do so, the plaintiff must then prove by a

---

[2] Because Plaintiff has failed to establish a question of material fact as to whether Plaintiff experienced a sexually hostile work environment, the court declines to rule upon Defendant's affirmative defense.

preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a mere pretext for unlawful retaliation. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).

Here, Defendant maintains that Plaintiff cannot establish either the first or the third element of her prima facie case. To establish element one, that she engaged in protected activity, Plaintiff must show that she opposed an employment practice that she could have reasonably believed was unlawful. *E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005); *see also Hopkins*, 77 F.3d at 754 (a Title VII oppositional retaliation claimant need not show that the underlying claim of harassment was in fact meritorious in order to prevail). Defendant does not contend that the June 8, 2010, incident report did not constitute Plaintiff's opposition of an employment practice, but does argue that Plaintiff did not believe, and could not have reasonably believed, that the text messages from Parnell constituted unlawful sexual harassment. ECF No. 26 at 22-3. Because the text messages in question were unsolicited, were unquestionably of a sexual nature, contained vulgar language, and directly referenced parts of Plaintiff's own body, the undersigned finds that a person could reasonably believe they constituted illegal sexual harassment. For these reasons the undersigned finds that by making the June 8, 2010, incident report, Plaintiff opposed an employment practice she reasonably could have believed was unlawful, thereby establishing the first element of her prima facie case.[3]

---

[3] Plaintiff also maintains that her attorney's letter to Platt of June 15, 2010, constitutes a second "opposition." While the letter from the attorney itself does not constitute opposition by Plaintiff, consultation of an attorney to determine one's legal rights is a protected activity under the law, and the letter establishes Defendant's knowledge of the consultation. *See Johnson v. Portfolio Recovery Assoc.*, 682 F. Supp. 2d 560, 576 (E.D. Va. 2009); *Rhoads v. FDIC*, 286 F. Supp. 2d 532 (D. Md. 2003). For the purpose of the instant motion, however,

As to the third element, that the opposition caused her discharge, the Fourth Circuit has held that "[v]ery little evidence of a causal connection is required to establish a prima facie case [of retaliation]." *Burgess v. Bowen*, C.A. No. 10-2081, 2012 WL 517190 at *10 (4th Cir. Feb. 17, 2012) (citing *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 443 (4th Cir.1998)) (overruled on other grounds). It has further been held that temporal proximity between the protected activity and the employer's adverse action alone will suffice. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *accord Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004). The Fourth Circuit has held evidence that the alleged adverse action occurred shortly after the employer became aware of the protected activity is sufficient to "satisf[y] the less onerous burden of making a prima facie case of causa[tion]." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (citing *Williams v. Cerberonics,* 871 F.2d 452, 457 (4th Cir. 1989)).

Here, there is no dispute that Plaintiff was discharged shortly after she made the report about the text messages. Defendant claims, however, that it made the *decision* to discharge Plaintiff before Plaintiff made her report of harassment, and therefore that it had no knowledge of the report at the time it made the decision to discharge. Because "by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case." *Dowe*, 145 F.3d at 657. Moreover, the Supreme Court has established that if Defendant's decision to take an adverse employment action was made before Defendant had knowledge of Plaintiff's opposition of an unlawful employment practice, Defendant cannot have made the decision based upon the

Plaintiff's June 8, 2010, incident report is enough to establish element one of her prima facie case. Therefore, the court need not consider any further opposition.

opposition. In *Clark County School District,* the Supreme Court reversed the Ninth Circuit's denial of summary judgment on the basis that the evidence showed the employer contemplated a detrimental transfer of an employee one day *before* it was made aware of her sexual harassment lawsuit, even though it followed through with the transfer *after* it learned of the suit. 532 U.S. at 273-74. The Court held, "[P]roceeding along lines previously contemplated, though not definitively determined, is no evidence whatsoever of causality." *Id.* at 272.[4] Therefore, if it can be shown that Defendant made the *decision* to discharge Plaintiff before Plaintiff made the report of harassment, then Defendant cannot be guilty of retaliation.

In this case, however, the record is somewhat unclear as to when the decision was made. On one hand, the decision-maker, Jerome Platt, testified that he had already made the decision before he was made aware of Plaintiff's allegations. ECF 26-1 at 58. In addition, the same incidents upon which Plaintiff's June 21, 2010, discharge was allegedly based were discussed with Plaintiff during the meeting on June 7, 2010, *before* the report was made on June 8, 2010. ECF No. 26-2 at 21, 49. During the June 7 meeting about the missing money, Platt stated, "This has to be follow [sic] up with disciplinary action," and "This could get serious." ECF No. 26-6 at 63. If this were the only evidence regarding when the decision

---

[4] Plaintiff cites the Fourth Circuit's decisions in *Okoli v. City of Baltimore*, 648 F.3d 216 (4th Cir. 2011), and *Burgess v. Bowen*, C. A. No. 10-2081, 2012 WL 517190 (4th Cir. Feb. 17, 2012) as standing for the proposition that, contrary to the Supreme Court's holding in *Clark County School District,* even if an employer makes a decision to discharge before it is made aware of a plaintiff's opposition, the opposition "might have been an additional or superseding cause." *Okoli*, 648 F.3d at 224. This statement by the Fourth Circuit is dictum, however, and was not a factor in the court's decision in either *Okoli* ("viewing the evidence in the light most favorable to Okoli, we can infer that [Defendant] did not intend to fire her before [the complaint]"), *Id*., at 22, or *Burgess* ("a jury could reasonably find that the decision to terminate Burgess…occurred only after Burgess [complained of discriminatory conduct]. *Burgess,* 2012 WL 517190 at *10. Therefore the undersigned relies on the clear statement of the United States Supreme Court on the issue as set forth in *Clark County School District*.

was made, it would tend to establish that the decision to discharge was made after the report of harassment was received.

On the other hand, Plaintiff points to the written position statement to the EEOC made after Plaintiff's discharge by Defendant's then Human Resources manager, stating that Platt met with Plaintiff on June 8, 2010 (rather than June 7, 2010, as record evidence corroborated by Plaintiff shows) with the "intention of terminating her employment," but that before he could do so, Plaintiff told him about the text messages. The position statement makes no mention of a June 7 meeting. ECF No. 28-1 at 5. Similarly, Plaintiff cites Platt's Answers to Interrogatories filed with the court, stating that he met personally with Bridges on June 8 to discharge her, and that later during the same meeting Plaintiff initially raised her claim of harassment. ECF No. 28-2. While these pieces of evidence are not contrary to Defendant's position that the decision had been made prior to the Plaintiff's making her incident report, they do show at the very least a conflict in the record about the dates of the meetings at which the incidents cited in Plaintiff's discharge were discussed. In addition, Plaintiff testified that she filled out the incident report during a meeting with Judge at which Platt was not present because he was out of town, and that her meeting with Platt was the day before. ECF No. 26-2 at 25-26. Finally, Platt testified that at some point before Plaintiff's discharge, but after her report, he asked Plaintiff if she needed to be moved to another shift. ECF No. 26-6 at 29. From this, a reasonable jury could infer the termination decision had not yet been made when Platt became aware of the incident report. The undersigned finds that the conflicting evidence about when the decision was made presents a question of material fact that would require a fact finder to weigh the evidence and assess the credibility of the witnesses. Upon review of the evidence in the record, a jury could reasonably find that

the decision to discharge Plaintiff was made *after* her report of sexual harassment. Thus, based upon the line of cases allowing very close temporal proximity alone to establish the causation element in the prima facie case, Plaintiff is able to make a prima facie case for retaliation.

Under the *McDonnell Douglas* framework, upon Plaintiff's establishment of a prima facie case, the burden then shifts to Defendant to articulate a legitimate non-discriminatory reason for the discharge. Discussing a defendant's burden of articulating a legitimate non-discriminatory reason within the *McDonnell Douglas* framework, the South Carolina District Court has explained, "What shifts is merely a burden of producing admissible evidence (something more than a pleading) that would, if believed, be legally sufficient to justify a judgment for the defendant. *Taylor v. Ingles Markets*, C. A. No. 802407227, 2004 WL 3591133 (D.S.C. Dec. 13, 2004) (citing *Tex. Dept. of Comm'ty Affairs v. Burdine*, 450 U.S. 248, 255 (1981)). The employer, however, does not have the burden of persuading the court that it was actually motivated by the proffered reason. *Id.*

Plaintiff argues that Defendant has not articulated a legitimate reason for her discharge because Platt only stated, "Keys, money" (without further elaboration) as the reason for her discharge during the June 21, 2010, termination meeting. ECF No. 28 at 11. She further argues that when questioned in his deposition about the reasons for Plaintiff's discharge, Platt failed to mention the incident about the missing key.[5] Plaintiff contends that these deficiencies demonstrate that Defendant has not sufficiently articulated its reason for the discharge. Plaintiff's argument notwithstanding, the undersigned finds that Defendant

---

[5] Platt actually did discuss the lost key in response to a question from Plaintiff's attorney regarding the decision to terminate, both with regard to the key policy violation and the issue surrounding looking for the key. He also discussed "work performance" and "supervision issues," in addition to "money missing from a parent." ECF No. 26-1 at 27, 30-32.

has supplied a legitimate, non-retaliatory reason for Plaintiff's termination which, if believed, would be legally sufficient to justify a judgment for Defendant. It does not matter in this analysis that a jury might not believe that reason, because there is no burden of persuasion required, only a burden of production to be met. "The defendant need not persuade the court that it was actually motivated by the proffered reasons. . . . It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. . . . The plaintiff retains the burden of persuasion. . . ." *Williams v. Sonoco Prods. Co*., C.A. No. 81-1469-0, 1982 WL 423 at *3-4 (D.S.C. Nov. 8, 1982) (citing *Burdine*, 450 U.S. at 255). Defendant has articulated that Plaintiff was discharged for a combination of violations, including the "violation of a key policy," the "supervision issue" regarding Plaintiff's being alone with a male student at a late hour to look for the key, together with the "money issue" involving Plaintiff's inability to account for student funds that had been entrusted to her. ECF Nos. 26-1 at 27-32, 28-5 at 18. Plaintiff testified in her deposition that she knew what the issues of the keys and the money were when Platt mentioned them in the discharge meeting. ECF No. 26-2 at 9. "The employer's burden is satisfied if he simply 'explains what he had done' or 'produce[es] evidence of legitimate, nondiscriminatory reasons.'" *Williams,* 1982 WL 423 at *3 (citing *Bd. of Trustees of Keene State Coll. v. Sweeney,* 439 U.S. 25 (1978)).

Upon Defendant's articulation of a legitimate non-retaliatory reason for the discharge, the burden shifts back to Plaintiff to prove by a preponderance of the evidence that the employer's stated reasons "were not its true reasons, but were a pretext for [retaliation]." *Reeves,* 530 U.S. at 143. Thus, to survive Defendant's Motion for Summary Judgment,

Plaintiff bears the burden of proving by a preponderance of the evidence that the reasons Platt gave for her discharge were merely pretext for retaliation.

Plaintiff contends that the reasons given for her discharge were pretextual because there is a factual dispute as to what was discussed with Plaintiff at the June 21, 2010 termination meeting. ECF No. 28 at 11. She argues that when she asked Platt during the termination meeting for the reasons for the discharge, he responded, "Keys, money," and that this conflicts with Platt's deposition testimony when asked the same question. She also argues there was "no discussion of discipline or an ongoing investigation" discussed in the June 7, 2010, meeting, so the meeting "could not have been that serious." *Id.* Even taken in the light most favorable to Plaintiff, these contentions do not carry Plaintiff's ultimate burden of showing that retaliation was a motivating factor in Defendant's decision to discharge her.

In *Reeves,* the Supreme Court clarified a plaintiff's burden to show pretext once the employer articulates a legitimate reason for its adverse action. The Court held a plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence. *Reeves*, 530 U.S. at 143 (citing *Burdine*, 450 U.S. at 256). Further, "although the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production," *St. Mary's Honor Ctr.*, 509 U.S. at 511, "evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom'. . . on the issue of whether the defendant's explanation is pretextual'" may still be considered. *Reeves*, 530 U.S. at 143, (citing *Burdine*, 450 U.S. at 255, n. 10.) The Court went on to say, ". . . [I]t is *permissible* . . . to infer the ultimate fact of discrimination from the falsity of the employer's explanation. . . . The . . . disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion

of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* [an inference] of the ultimate fact of intentional discrimination." *Id.* at 511. (emphasis in original). The *Reeves* Court further stated, "The ultimate question is whether the employer intentionally discriminated, and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.*" Reeves*, 530 U.S. at 146 (citing *St. Mary's Honor Ctr.,* 509 U.S. at 524). "In other words, [i]t is not enough . . . to *dis* believe the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Id.* at 519. Finally, the Court stated, "Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves*, 530 U. S. at 148.

In the present case, Plaintiff has established a prima facie case, but Plaintiff has not set forth sufficient evidence to reject Defendant's explanation. Plaintiff attempts to show that the reasons given for her discharge must be false because she was not told when Platt discussed the issues with her that he planned to discipline or discharge her for them. Further she contends the reasons given are false because Platt's reference to them at Plaintiff's discharge was very short, and because during his deposition, he did not refer to all the reasons when Plaintiff's attorney first asked him about them.[6] As tersely articulated as they might have been, the reasons given by Defendant have been consistent. "Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt

---

[6] *See* footnote 5 herein.

on the explanations' validity . . . ." *Hux v. City of Newport News, Va.,* 451 F.3d 311, 315 (4th Cir. 2006). Further, Defendant has never offered a conflicting reason for Plaintiff's discharge, but rather has always cited the issues relating to the night Plaintiff returned to camp to look for the missing key, and to the handling of the student's money. *EEOC v. Sears Roebuck and Co*., 243 F.3d 846 (4th Cir. 2001) (The fact that Defendant offered different justifications at different times for [the adverse action] is . . . probative of pretext). More importantly, Plaintiff does not dispute that she did the things Defendant said she did. Instead, she offers her own unsupported opinion that getting a male student out of the dorm to be with her alone at night was not a problem, and states she was unaware of Defendant's policies regarding the handling of keys or student money.

Plaintiff clearly feels she should not have been fired for the key issue and the money issue. She has failed, however, to show that, unfair as they might have seemed to her, these were not the employer's reasons. *See DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) ("[T]his court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination . . . .") (internal quotation marks omitted); *Henson v. Liggett Grp., Inc*., 61 F.3d 270, 277 (4th Cir. 1995) ("We have recognized the importance of giving an employer the latitude and autonomy to make business decisions, including workplace reorganization, as long as the employer does not violate the ADEA."); *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 377 (4th Cir. 1995) ("Title VII is not a vehicle for substituting the judgment of a court for that of the employer").

Even if the issues cited by Plaintiff could be said to constitute a showing by a preponderance of the evidence that Defendant's stated reasons were untrue, the ultimate

question is whether Defendant unlawfully retaliated against Plaintiff. *See Reeves,* 530 U.S. at 146 "It is not enough to disbelieve the [employer]." *Love-Lane v. Martin*, 355 F.3d 766, 788 (4th Cir. 2004). Plaintiff must show a reasonable jury could "believe [her] explanation" of why she was terminated. *Id.* Here, Plaintiff's explanation of why she was terminated is that Defendant retaliated against her for reporting sexual harassment. This is mere speculation, however. Plaintiff points to no evidence that shows Platt wanted to retaliate against her for making a harassment report. If anything, the record evidence establishes that Plaintiff's real belief was that Abraham and Parnell wanted her fired because she reported Abraham for poor behavior towards a student at the AMI Olympics.

The Fourth Circuit explains, "*Reeves* . . . allows a trier of fact to infer discrimination from the falsity of an employer's explanation for an adverse employment action . . . . [It], however, does not stand for the proposition that a non-movant can create a genuine issue of material fact from mere speculation. Inferences must 'fall within the range of reasonable probability and not be so tenuous as to amount to speculation and conjecture.'" *Khan v. Worcester Cnty.,* C.A. No. 01-1049 (2001 WL 1660874 at **4) (4th Cir. Dec. 28, 2001) (citing *Thompson Everett, Inc., v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995). Plaintiff has insufficient evidence to show Defendant's articulated reasons for her discharge were untrue, and there is no support for a speculative inference that retaliation for her report of harassment was a motivation for her discharge. Because she cannot carry the requisite burden of proof in this regard, Plaintiff's cause of action for retaliatory discharge should fail.

III.     Recommendation

For the foregoing reasons, Defendant's Motion for Summary Judgment, ECF No. 26, should be granted, and Plaintiff's causes of action for hostile work environment and retaliation in violation of Title VII should be dismissed.

IT IS SO RECOMMENDED.


May 24, 2012                                      Kaymani D. West
Florence, South Carolina                         United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**